

# NUMBER 13-17-00510-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI–EDINBURG

---

H & H SAND AND GRAVEL, INC.,
A TEXAS CORPORATION,                                              Appellant,

v.

SUNTIDE SANDPIT, INC., A TEXAS
CORPORATION; MIKE HURST,
INDIVIDUALLY; PHIL HURST,
INDIVIDUALLY; AND ERMA
STILLWELL, DECEASED,                                              Appellees.

---

### On appeal from the 148th District Court
### of Nueces County, Texas.

---

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Longoria and Perkes**
**Memorandum Opinion by Justice Perkes**

Appellant H & H Sand and Gravel, Inc. (H & H) was awarded contractual damages against appellees Suntide Sandpit, Inc.[1] (Suntide) and Erma Stillwell (Stillwell), but not against Mike Hurst (Mike) and Phil Hurst (Phil).[2]  By three issues, H & H argues that the trial court erred in failing to:  (1) instruct the jury on the Texas Construction Trust Fund Act (the Act), spoliation of evidence, and piercing the corporate veil; (2) enforce its discovery order and grant death penalty sanctions; and (3) enter a final judgment awarding H & H contingent appellate attorney's fees.  We affirm.

## I.  BACKGROUND

On February 2, 1999, Suntide placed a bid with the City of Corpus Christi (the City) to provide a "Commodity:  Material for Sector Liner Construction."  The bid sheet included the following description:

> Supply agreement for material for sector liner construction in accordance with Specifications No. 837.  The term of this supply agreement will be for twelve months with options for two additional twelve-month periods subject to approval of the contractor and the City Manager, or his designee.  The supply agreement is to commence approximately May 1, 1999.

Under the line item for "sand," Suntide placed a bid for 35,000 tons at $6.95 a unit, for a total bid of $243,250.  On the same day, H & H placed a bid for 35,000 tons of sand at $7.05 a unit, for a total bid of $246,750.  On June 29, 1999, the City granted Suntide the purchase order agreement.[3]  At the time of the agreement, Stillwell was the president, sole shareholder, and sole director of Suntide; Mike was the general manager; and Phil

---

[1]  Suntide Sandpit, Inc., is a Texas corporation doing business as Suntide Materials & Trucking.

[2]  Suntide and Stillwell are appellees herein for the sole purpose of opposing appellant's request for contingent appellate attorney's fees.

[3]  The terms and conditions of the supply agreement dictated that the Uniform Commercial Code (UCC) would govern.

was a salesman, who was also responsible for on-site environmental operations on various projects.[4]

Suntide contracted with H & H to provide the sand needed to fulfill Suntide's agreement with the City. From August to November 1999, H & H provided Suntide with $142,684.49 worth of sand. Suntide fell behind on its payments to H & H. On October 28, 1999, the two companies executed an agreement, which read in its entirety: "Suntide Materials & Trucking will agree to have joint checks made payable to Suntide and H & H Sand at P.O. Box 329, Odem TX 78370 until the old balance of $47,213.73 is paid on our account for the sand haul on the City of Corpus Christi job at the Landfill." The agreement was typed on Suntide stationery and signed by Mike. A copy of the letter was also provided to the City.

The City, not a party to Suntide and H & H's agreement, continued to pay Suntide directly for the sand. The City made two payments to Suntide following the written agreement between Suntide and H & H: (1) on November 15 for $82,861.73; and (2) on December 21 for $68,652.17.[5] Suntide then paid $45,000 to H & H in November and $40,000 in December. By January 31, 2000, Suntide had failed to bring its account current, owing H & H a balance of $57,162.27. Throughout 1999 and 2000, it was undisputed that Suntide was insolvent and unable to pay its debts. In 2000, Suntide ceased doing business and filed its final return with the Internal Revenue Service.[6]

---

[4] Mike and Phil are Stillwell's sons.

[5] Under the supply agreement, the City paid Suntide a total amount of $239,104.68.

[6] Although Suntide maintained it discontinued all business in 2000, its corporate charter was not forfeited until February 9, 2007, following its nonpayment of franchise taxes.

3

On July 11, 2002, H & H sued the City, Suntide, Mike, Phil, and Stillwell, seeking monetary damages for breach of constructive trust, negligence, negligence per se, fraud, and breach of constructive trust. On October 16, 2002, as part of its ongoing discovery, H & H requested production of tax documents, namely, "Copies of any federal or state income tax returns filed by Defendants, including any accompanying worksheets, schedules or K-1 forms for the five tax years preceding the date of this Request for Production of Documents."

On November 15, 2002, the defendants filed an objection to written discovery and motion for a protective order. The record is silent about whether the motion for protective order was heard or ruled on. Stillwell died on May 17, 2008, following two interlocutory appeal proceedings.[7]

On June 10, 2009, the defendants filed an amended objection to written discovery and motion for protective order. Five days later, H & H filed a motion to compel full responses and request for sanctions. On June 30, the trial court judge signed a protective order, excusing Mike, Phil, and Stillwell from H & H's tax documentation discovery requests. H & H filed a petition for writ of mandamus, requesting that this Court direct the trial court to vacate the protective order. *In re H & H Sand & Gravel, Inc.*, No. 13-09-00551-CV, 2009 WL 3757019, at *1 (Tex. App.—Corpus Christi Nov. 6, 2009, orig. proceeding) (per curiam) (mem. op.). On November 6, 2009, this Court denied H & H's petition for writ of mandamus. *Id.*

---

[7] In 2005, the City filed an interlocutory appeal of the trial court's denial of the City's plea to the jurisdiction. This Court reversed and remanded. *City of Corpus Christi v. H & H Sand & Gravel, Inc.*, No. 13-05-306-CV, 2005 WL 3216679, at *1 (Tex. App.—Corpus Christi–Edinburg Dec. 1, 2005, no pet.) (per curiam) (mem. op.). In 2007, H & H appealed the trial court's dismissal of its suit against the City for want of jurisdiction. This Court affirmed. *H & H Sand & Gravel, Inc. v. City of Corpus Christi*, No. 13-06-00677-CV, 2007 WL 3293628, at *4 (Tex. App.—Corpus Christi–Edinburg Nov. 8, 2007, pet. denied) (mem. op.).

Following the successful appeal of the trial court's summary judgment order in favor of the defendants,[8] H & H filed another motion to compel and request for sanctions in 2013. H & H sought the documents subject to the court's 2009 protection order. On September 27, 2013, the trial court denied H & H's motion to compel and request for sanctions. Also in September, individual defendants Phil and Mike, along with their brother Joe Hurst (Joe), participated in depositions.[9]

At a pretrial conference on February 20, 2015, five years after the protective order was signed, the trial court signed an order to compel the individual defendants to produce their tax returns. At the hearing, defense counsel stated Mike's Form 1040 from 1999 was in counsel's possession, as was a summary of Phil's. Counsel expressed doubts as to the defendants' ability to retrieve personal tax documentation for Stillwell when no probate administrator existed with standing to request the documentation from the Internal Revenue Service. On August 7, H & H informed the court that it still had not received the defendants' tax returns and filed another motion to compel and request for sanctions. The court signed its second order to compel the production of tax documents, and ordered a monetary sanction in the amount of $2,125.69. On August 27, the individual defendants filed a motion to reconsider sanctions and paid $2,125.69, held in the registry of the court pending the resolution of their request for reconsideration.

---

[8] *Suntide Sandpit, Inc. v. H & H Sand & Gravel, Inc.*, No. 13-11-00323-CV, 2012 WL 2929605, at *1 (Tex. App.—Corpus Christi–Edinburg July 19, 2012, pet. denied) (mem. op.) ("Appellee moved for summary judgment against only Suntide but all appellants responded to the motion. The trial court entered judgment against all appellants, jointly and severally, for $57,252.07 in actual damages plus $300,000 in punitive damages for conversion of trust funds, negligence per se, and gross, willful and wanton acts constituting actual or constructive fraud, plus attorney's fees, and post judgment interest." We held H & H failed to sustain its summary judgment burden.).

[9] Joe was one of Stillwell's sons. He was not employed with Suntide, and he was not a party to the suit. He was deposed because he, along with several family members, cleared out Stillwell's belongings—including personal financial records and personal tax records—at some point after her death.

The trial court held a hearing on the defendants' motion for reconsideration of sanctions eight months later on April 21, 2016, and took the matter under advisement. Absent a ruling, H & H filed another motion for sanctions on September 16, this time requesting a death penalty sanction, $160,000 in attorney's fees, $100,000 in sanction fees, and the defendants' $2,125.69 in the court's registry. The defendants filed a response on September 28, and the court held a hearing on September 30. On October 12, the court issued an order sustaining sanctions in the amount of $2,125.69. The requested tax documents were never produced. H & H did not bring forth any other motions for sanctions regarding the nonproduction.

At trial, the judge denied H & H's specific instructions for the jury charge.[10] Instead, the question posed to jurors tracked the Texas Pattern Jury Charge and read, as to each individual defendant, as follows:

Is [individual defendant] responsible for the conduct of [Suntide]?

[Individual defendant] is "responsible" for the conduct of [Suntide] if [Suntide] was organized and operated as a mere tool or business conduit of [individual defendant] and there was such unity between [Suntide] and [individual defendant] that the separateness of [Suntide] had ceased and holding only [Suntide], responsible would result in injustice; and [individual defendant] caused [Suntide] to be used for the purpose of perpetrating and did perpetrate an actual fraud on [H & H] primarily for the personal benefit for [individual defendant].

In deciding whether there was such unity between [Suntide] and [individual defendant] that the separateness of [Suntide] had ceased, you are to consider the total dealings of [Suntide], and [individual defendant], including:

1. the degree to which [Suntide]'s property had been kept separate from that of [individual defendant];

2. the amount of financial interest, ownership, and control [individual defendant] maintained over [Suntide]; and

---

[10] H & H's proposed jury questions spanned forty-four pages.

3. whether [Suntide] had been used for personal purposes of [individual defendant].

Answer "yes" or "no"

The trial judge also refused H & H's requests to include instructions on spoliation and on the Act.

The jury found against Suntide and determined Stillwell liable, but not Mike or Phil. The court rendered judgment reflecting the jury's verdict against Suntide for $47,576.79, together with attorney's fees in the amount of $139,158.72, and against Stillwell for $47,576.79. The court rendered take nothing judgments in favor of Mike and Phil. Although appellees' counsel testified and presented evidence on contingent appellate attorney's fees, no appellate attorney's fees were awarded. This appeal followed.

## II. JURY INSTRUCTIONS

In its first issue, H & H argues the trial court abused its discretion by refusing to submit a jury instruction on: (1) the Act; (2) spoliation of evidence; and (3) piercing the corporate veil. *See* TEX. BUS. ORGS. CODE ANN. § 21.223; TEX. PROP. CODE ANN. § 162.001; TEX. R. CIV. P. 215.2(b).

We review a challenge to the trial court's jury charge under an abuse of discretion standard. *State v. Luby's Fuddruckers Restaurants, LLC*, 531 S.W.3d 810, 819 (Tex. App.—Corpus Christi–Edinburg 2017, no pet.). A trial court has wide discretion in submitting instructions, and a court abuses its discretion when it acts without reference to any guiding rules or principles. *Caffe Ribs, Inc. v. State*, 487 S.W.3d 137, 142 (Tex. 2016) (citing *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985)).

A jury instruction is proper "if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence." *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 855 (Tex. 2009) (citing *Tex. Workers' Comp. Ins. Fund v. Mandlbauer*, 34 S.W.3d 909, 912 (Tex. 2000)); *see* TEX. R. CIV. P. 277. Only if we determine that the jury charge was erroneous, do we consider whether the error requires reversal. *See Transcon. Ins. Co. v. Crump,* 330 S.W.3d 211, 225 (Tex. 2010).

## A.  Texas Construction Trust Fund Act

H & H argues on appeal that the contract between the City and Suntide was a supply agreement in name only, and the Act applied because it was actually a construction contract.

The Act creates a cause of action for a contractor's failure to pay beneficiaries from a maintained construction trust account, where all construction payments under a construction contract are received and appropriately recorded. *See* TEX. PROP. CODE ANN. §§ 162.001(a), 162.007. All payments, unless explicitly otherwise accounted for, made to a contractor under a "construction contract" are deemed trust funds under the Act. *Id.* § 162.001(a). Any "artisan, laborer, mechanic, contractor, subcontractor, or materialman who labors or who furnishes labor or material" may be beneficiaries of the trust. *Id.* § 162.003.

Chapter 162 does not define "construction contract" or "construction." *See id.* § 162.005 (defining terms for purposes of the chapter). Because the terms are not defined in the property code, we turn to the Code Construction Act for guidance. *See id.* § 1.002. The Code Construction Act provides that "[w]ords and phrases shall be read in

8

context and construed according to the rules of grammar and common usage." TEX. GOV'T CODE ANN. § 311.011(a).

We have found no Texas authority, and H & H provides none, to address the exact issue of whether contracting for the supply of a material used for a separately contracted-for construction of real property is itself a "construction contract." However, several courts have defined "construction" in the context of improvements to real property. *See, e.g.*, *Burke v. Brown*, 30 S.W. 936, 936 (Tex. App.—Galveston 1895, no writ) (finding "construction" to be synonymous with "erection"); *Jerry v. Ky. Cent. Ins. Co.*, 836 S.W.2d 812, 816 (Tex. App.—Houston [1st Dist.] 1992, writ denied) (holding construction meant "creation of a new structure"). Moreover, Black's Law Dictionary defines "construction contract" as a "contract setting forth the specifications for a building project's construction." *Construction contract*, BLACK'S LAW DICTIONARY (9th ed. 2009).[11] And "construction" is defined as "the act of building by combining or arranging parts of elements; the thing so built." *Construction*, BLACK'S LAW DICTIONARY (10th ed. 2014).

H & H relies on *Dealers Electrical Supply Co. v. Scroggins Construction Co.* to support its position that Suntide partook in a construction contract. 292 S.W.3d 650, 652 (Tex. 2009). In *Dealers*, Scroggins entered into a contract with a school district to build a new elementary school. *Id.* Scroggins subcontracted out labor and materials to Dealers but failed to pay Dealers for materials received. *Id.* The Court held Scroggins was subject to the Act's requirements, and therefore monies received by Scroggins should have been properly set aside in a trust for Dealers. *Id.*

---

[11] The tenth edition of Black's Law Dictionary does not contain a definition for "construction contract."

9

*Dealers*, however, is not instructive in our construction contract analysis because it was undisputed there that Scroggins was tasked at constructing a new elementary school, and its contract reflected that constructive, labor-oriented intent. *Id.* Here, the business responsible for the construction project, the sector liner for the City, is not a party to this suit; rather, the parties are Suntide, an entity which contracted with the City to supply a material, and H & H, an entity which contracted with Suntide to supply said material. H & H is undoubtably a subcontractor for Suntide, but the question is not whether H & H was a subcontractor; it is whether Suntide entered into a "construction contract" with the City, rendering its received payments subject to the Act's requirements. *See id.*; *see also* TEX. PROP. CODE ANN. § 162.001(a).

The contract between Suntide and the City does not "set[] forth the specifications for a building project's construction." *See Construction contract*, BLACK'S LAW DICTIONARY (9th ed. 2009). Rather, the terms of the contract provide for a "sale of goods and services." The contract states "[Suntide] will transfer and deliver to the City and the City will pay for and accept all of the City's requirements during the term of this agreement for all the items described on the Bid Sheet." The contract's "Standard Purchase Terms and Conditions" is similarly instructive. The conditions include a governance provision: "[T]his agreement shall be governed by the [UCC]." The UCC, although applicable to purchase orders and supply contracts in which the supplier is only responsible for delivering the materials, would not be applicable in a contract for the construction. *See* TEX. BUS. & COM. CODE ANN. § 2.102; *see also* TEX. CONSTR. LAW MANUAL § 7:2 (3d ed.).

H & H argues the fact that the contract and bid documentation submitted by the City include the phrase "material for sector liner construction" twenty-nine times is

10

evidence of a construction contract. But the same documents also include the words "supply agreement." Suntide did not enter into a construction contract merely because it contracted to provide a commodity for the City that would be used by another company for a construction project. Absent the existence of a "construction contract," the Act does not apply. See TEX. PROP. CODE ANN. § 162.001. Therefore, the trial court did not err in failing to instruct the jury on the Act, an inapplicable provision. See Hawley, 284 S.W.3d at 855.

## B. Spoliation of Evidence

A spoliation analysis involves a two-step judicial inquiry: "(1) the trial court must determine, as a question of law, whether a party spoliated evidence, and (2) if spoliation occurred, the court must assess an appropriate remedy." Brookshire Bros. v. Aldridge, 438 S.W.3d 9, 14 (Tex. 2014). As to the first step, the court "must find that (1) the spoliating party had a duty to reasonably preserve evidence, and (2) the party intentionally or negligently breached that duty by failing to do so." Id. A duty to preserve evidence arises "when a party knows or reasonably should know that there is a substantial chance that a claim will be filed and that evidence in its possession or control will be material and relevant to that claim." Wal-Mart Stores, Inc. v. Johnson, 106 S.W.3d 718, 722 (Tex. 2003). However, if a party is shown to have had a duty to preserve evidence, "it is inherent that a party breaches that duty by failing to exercise reasonable care to do so." Aldridge, 438 S.W.3d at 20.

Given the impact spoliation can have on a case, courts have broad discretion to utilize a variety of remedies to address spoliation, including a spoliation jury charge instruction. Id. "[A] spoliation instruction has the propensity to tilt a trial in favor of a

11

non-spoliating party, [and] it can, in some sense, be tantamount to a death-penalty sanction." *Brookshire*, 438 S.W.3d at 23. Therefore, a trial court may submit an instruction "*only if* it finds that (1) the spoliating party acted with intent to conceal discoverable evidence, or (2) the spoliating party acted negligently and caused the non-spoliating party to be irreparably deprived of any meaningful ability to present a claim or defense." *Wackenhut Corp. v. Gutierrez*, 453 S.W.3d 917, 921 (Tex. 2015) (per curiam) (emphasis added).

In *Wackenhut*, the trial court submitted a spoliation instruction after finding Wackenhut failed to preserve a complete visual recording of the slip-and-fall accident at the crux of the suit. *Id.* The Texas Supreme Court reversed, holding that the jury instruction on spoliation had been improper because the spoliation did not "irreparably deprive[] [the plaintiff] of a meaningful ability to present his claims"; the plaintiff was still able to rely on testimony of witnesses, photographs of the accident scene, and extensive medical records. *Id.*

H & H argues the individual defendants intentionally destroyed tax and financial records during the pendency of the litigation, and alternatively, their negligence irreparably impeded H & H's ability to present its claims. H & H made its initial request for tax documentation the same year the suit was filed—in 2002. In 2009, following failed mediation and two interlocutory appeals, the trial judge signed a protective order shielding Stillwell and her sons from H & H's requests for personal tax documentation. In 2013, Stillwell's son Joe was deposed, and he testified that he had destroyed all of his mother's personal financial records at some point after her death when clearing out her estate. Joe testified that he wasn't employed or involved with Suntide, he was unable to speak

to Suntide's management structure or financial obligations, and he first found out about the lawsuit the week before he was contacted to appear for the deposition.

Here, the trial court provides no insight into its spoliation analysis; we only know that the trial court denied H & H's request for an instruction on spoliation. We will, nonetheless, presume the trial court found the defendants had a duty to preserve the evidence because (1) the lawsuit was already underway, and (2) although the protective order was in place, the defendants were already on notice that plaintiffs sought that information. *See Johnson,* 106 S.W.3d at 722.

Because the remedy for spoliation requested here is a jury instruction, we next evaluate whether defendants acted with intent to conceal or negligently cause the non-spoliating party to be irreparably deprived of any meaningful ability to present a claim or defense. *Wackenhut*, 453 S.W.3d at 921. There is no evidence to support that the individual defendants here—Stillwell (deceased), Mike, and Phil—were responsible for the destruction of the evidence in question; therefore, the trial court's implicit finding that the defendants did not act with the requisite intent is supported by the record. *See id.* Additionally, H & H sought Stillwell's financial documents to show the transfer of Suntide's monies to Stillwell in furtherance of its piercing the corporate veil theory. However, in its possession, H & H already had: (1) checks from Suntide indicating payments to Stillwell, and (2) Suntide's account and operation statements, which included all deposit copies and copies of all checks into and out of Suntide's account between July 31, 1999 and April 30, 2000.

The information in H & H's possession provided evidence in support of the same argument H & H sought to make with Stillwell's personal tax documentation. *See id.*

Despite any alleged negligence on the part of the defendants, H & H was not "irreparably deprived of any meaningful ability to present a claim or defense," as H & H ultimately prevailed in a claim over Stillwell at trial. *Id.* Therefore, the trial court did not abuse its discretion in excluding a spoliation instruction. *See Hawley,* 284 S.W.3d at 855.

## C. Piercing the Corporate Veil

H & H next broadly argues the court "failed to instruct the jury on the elements of piercing the corporate veil." However, the instructed charge here tracked the Texas Pattern Jury Charge broad form question for piercing the corporate veil and the accompanying instruction on alter ego verbatim. *See* TEX. PATTERN JURY CHARGES: BUSINESS, CONSUMER, INSURANCE & EMPLOYMENT §§ 108.1, 108.2 (2018 ed.). A trial judge does not err by giving a charge that tracks pattern jury instructions that are supported by the law. *See United States v. Whitfield*, 590 F.3d 325, 354 (5th Cir. 2009); *see, e.g.*, *Viajes Gerpa, S.A. v. Fazeli*, 522 S.W.3d 524, 531 (Tex. App.—Houston [14th Dist.] 2016, pet. denied.); *Penhollow Custom Homes, LLC v. Kim*, 320 S.W.3d 366, 373 (Tex. App.—El Paso 2010, no pet.).

Further, H & H does not state the specific question, definition, instruction, or omission it takes issue with. *See* TEX. R. APP. P. 38.1(g) ("The brief must state concisely and without argument the facts pertinent to the issues or points presented."), (i) ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record."). Failure to provide the necessary argument or analysis can result in waiver. *RSL Funding, LLC v. Newsome*, 569 S.W.3d 116, 126 (Tex. 2018), *reh'g denied* (Mar. 29, 2019). We are without direction and decline

14

to address H & H's final jury instruction claim of error, determining it has been inadequately briefed.  *Id.*  We overrule issue one.

### III. SANCTIONS

In its second issue on appeal, H & H argues the trial judge erred in "failing to enforce its sanction order" and in not awarding the death penalty sanction after Suntide did not comply with the court's second written order within a six-month period in a lawsuit spanning nearly two decades.

We review a trial court's award or denial of sanctions for an abuse of discretion, deferring to the trial court's factual determinations and evaluating whether the record supports the trial court's resolution of factual matters.  *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007).   The test for abuse of discretion is whether the trial court acted without reference to guiding rules and principles.  *See Downer*, 701 S.W.2d at 241–42.   The trial court's ruling should be reversed only if it was arbitrary or unreasonable.  *Id.* at 242.

Texas Rule of Civil Procedure 215.2 provides for sanctions that a trial court may impose for failure to comply with a discovery order or request.   TEX. R. CIV. P. 215.2(b). Sanctions are used to assure compliance with discovery and to deter those who might be tempted to abuse discovery in the absence of a deterrent.   *Downer*, 701 S.W.2d at 242. However, a trial court may not impose a sanction that is more severe than necessary to satisfy its legitimate purpose.  *Hamill v. Level*, 917 S.W.2d 15, 16 (Tex. 1996) (per curiam).   "Rule 215 requires that any sanctions imposed be 'just,'" which means:   (1) "a direct relationship must exist between the offensive conduct and the sanction" and (2) "the sanctions must not be excessive."  *Cire v. Cummings*, 134 S.W.3d 835, 839 (Tex. 2004).

15

In extraordinary situations of discovery-order violation, the trial court may issue "death penalty" sanctions, for example: strike a party's pleading, dismiss the party's action, render a default judgment, and preclude the presentation of the merits of the case. *Id.* Death penalty sanctions are appropriate as an initial sanction only in the egregious and exceptional case when they are "clearly justified and it is fully apparent that no lesser sanctions would promote compliance with the rules." *GTE Commc'ns Sys. Corp. v. Tanner*, 856 S.W.2d 725, 729 (Tex. 1993); *see, e.g.*, *In re RH White Oak, LLC*, 442 S.W.3d 492, 500–03 (Tex. App.—Houston [14th Dist.] 2014, orig. proceeding) (holding death penalty sanction improper where counsel failed to comply with discovery deadlines); *Gunn v. Fuqua*, 397 S.W.3d 358, 375 (Tex. App.—Dallas 2013, pet. denied) (same).

H & H filed multiple motions for sanctions, requesting a death penalty sanction for the first time in its September 16, 2016 motion. In response to that motion, the judge ordered a monetary sanction in the amount of $2,125.69. This sanction followed two court orders signed in February 2015 and August 2015. Rather than argue that the trial court's imposition of a monetary sanction was an insufficient remedy, H & H narrowly argues on appeal that the trial court erred in "failing to enforce its sanction order(s)." Evaluating only the latter, we hold that the court did enforce its order in the form of assessing monetary sanctions for noncompliance. *See* TEX. R. CIV. P. 215.2(b); *see, e.g.*, *TransAmerican Nat. Gas Corp. v. Powell*, 811 S.W.2d 913, 921–22 (Tex. 1991).

Moving to the issue of whether the court erred in failing to apply a death penalty sanction, the case facts here remain distinguishable from egregious situations where courts have held that a death penalty sanction was not an abuse of discretion. *See, e.g.*,

16

*Imagine Auto. Grp. v. Boardwalk Motor Cars, Ltd.*, 430 S.W.3d 620, 642–45 (Tex. App.—Dallas 2014, pet. denied) (holding that death penalty sanction was appropriate where prior to the sanction, trial court held hearings and issued discovery orders on six different dates, granted continuances of trial settings, and imposed monetary sanctions); *Response Time, Inc. v. Sterling Commerce (N. Am.), Inc.*, 95 S.W.3d 656, 659–64 (Tex. App.—Dallas 2002, no pet.) (holding that it was not an abuse of discretion in case where plaintiff "fabricated evidence to support a defamation claim, and it presented false arguments and evidence to court").

At the time of the court's imposition of monetary sanctions in 2016, litigation had been ongoing since 2002; the court had disrupted its 2009 protective order in ordering the production of the defendants' individual tax documents in 2015; and the individual defendants had testified to their attempts to procure the decades-old tax information. While it is concerning that the defendants never produced the documents prior to trial, we are unable to factor that into our review and look only to what the trial court knew at the time of its ruling. *Low*, 221 S.W.3d at 614. Having considered the record in this case, we are unable to hold that the trial court abused its discretion in its failure to apply a death penalty sanction. *See Hamill*, 917 S.W.2d at 16; *Downer*, 701 S.W.2d at 242. We overrule issue two.

## IV. CONTINGENT APPELLATE ATTORNEY'S FEES

In its last point on appeal, H & H argues the trial court erred in entering a final judgment that awarded zero contingent appellate attorney's fees. Although a prevailing party in the trial court may be entitled to appellate attorney's fees, the procurement of those fees is contingent on the party's success on appeal. *Ventling v. Johnson*, 466

S.W.3d 143, 155 (Tex. 2015). The contingency designation is to "discourage vexatious, time-consuming and unnecessary litigation." *Id.* (quoting *Gates v. City of Dallas,* 704 S.W.2d 737, 740 (Tex. 1986) (internal quotations omitted)). As H & H has not prevailed on any issue in this appeal, issue three is overruled as moot. *Id.*; *see, e.g.*, *Neal v. SMC Corp.*, 99 S.W.3d 813, 818 (Tex. App.—Dallas 2003, no pet.).

## V. CONCLUSION

We affirm the judgment of the trial court.

GREGORY T. PERKES
Justice

Delivered and filed the
30th day of May, 2019.